## S00Y1937. IN THE MATTER OF JOHN THOMAS WOODALL.
### (541 SE2d 649)

PER CURIAM.

This disciplinary matter is before the Court pursuant to the Report of the Review Panel of the State Disciplinary Board alleging Respondent John Thomas Woodall violated Standards 4 (a lawyer shall not engage in professional conduct involving dishonesty, fraud, deceit, or wilful misrepresentation); 30 (except with the written consent or written notice to his client after full disclosure a lawyer shall not accept or continue employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property or personal interests); 31 (a) (a lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee); 31 (d) (2) (upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the following: (i) the outcome of the matter; and (ii) if there is a recovery: (aa) the remittance to the client; (bb) the method of its determination; (cc) the amount of the attorney fee; and (dd) if the attorney's fee is divided with another lawyer who is not a partner in or an associate of the lawyer's firm or law office, the amount of fee received by each and the manner in which the division is determined); 36 (a lawyer shall not continue multiple employment if the exercise of his independent professional judgment on behalf of a client will be or is likely to be adversely affected by his repre-

sentation of another client, except to the extent permitted under Standard 37); 44 (a lawyer shall not without just cause to the detriment of his client in effect wilfully abandon or wilfully disregard a legal matter entrusted to him); 61 (a lawyer shall promptly notify a client of the receipt of his funds, securities or other properties and shall promptly deliver such funds, securities or other properties to the client); and 63 (a lawyer shall maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and promptly render appropriate accounts to his client regarding them) of Bar Rule 4-102 (d). Pursuant to Bar Rule 4-219 (a), Woodall timely filed exceptions to the Review Panel's report. The Review Panel recommends that for his violations of Standards 4, 30, 31 (a), 31 (d) (2), 36, 44, 61, and 63, Woodall be disbarred with a special condition that prior to submitting any application for reinstatement to the Bar, Woodall shall make full restitution to the estate involved of all moneys he received in regard to his representation of the estate. We agree.

The State Bar brought a Formal Complaint against Woodall in December 1997 alleging violations of Standards 4, 30, 31 (a), 31 (d) (2), 36, 44, 61, 63, and 65 (A) (a lawyer shall not fail to account for trust property, including money and interest paid on the client's money, if any, held in any fiduciary capacity) and asserting that Woodall should disgorge any fees collected to the estate as Woodall had lost the right to collect any fees due to his unprofessional conduct. Subsequent to an evidentiary hearing, the special master filed a report on March 29, 2000 pursuant to Bar Rule 4-217 finding that Woodall violated Standards 4, 30, 31 (a), 31 (d) (2), 36, and 44 of Bar Rule 4-102 (d) and basing his conclusion on the following findings of fact:

In September 1994, attorney David Roberson was retained to represent a 34-year-old woman ("the patient"), who had slipped into a coma after complications arose during a routine Caesarian section performed in August 1994 at Savannah's Memorial Medical Center. Roberson was retained by the patient's common-law husband to file a malpractice suit on behalf of his wife as well as a loss of consortium claim for himself, and the husband and Roberson executed an Authority to Represent agreement (the "Fee Agreement") whereby Roberson was to receive a 40 percent contingent fee. The husband only dealt with Roberson, not Woodall, in connection with the Fee Agreement. Roberson subsequently filed papers with the probate court to have the husband appointed as the patient's guardian, a process in which Woodall was not involved.

Woodall subsequently was hired by Roberson, who obtained permission from the husband and had informed him that Woodall's fees would be Roberson's obligation, to assist Roberson in litigating the

case. Roberson told Woodall that he had a 50 percent contingent fee contract with the husband. Woodall's relationship with Roberson in this matter was the same as with previous cases they had litigated together with no written contract being executed between Woodall and Roberson, Woodall not having any personal contact with Roberson's clients, and Woodall receiving his instructions and payment from Roberson. In April 1995, Roberson and Woodall filed suit on behalf of the husband, both as the patient's guardian and individually, alleging counts for medical malpractice and loss of consortium. In September 1995, Roberson met with the husband and his sister to discuss the Fee Agreement and informed the husband that because expenses associated with the case were escalating, Roberson needed the husband to contribute $10,000 to help defray the costs. When the husband stated that he did not have $10,000 to pay Roberson, Roberson suggested that the parties amend the Fee Agreement and they did, with the new contract providing that Roberson was to receive 50 percent of the proceeds of any recovery in the malpractice action. It is undisputed that Woodall was not a part of the contingency fee negotiations.

On the eve of trial, Roberson and Woodall learned that the husband had impregnated another woman during the time the patient lay comatose in the hospital, a fact that could have an adverse impact on the patient's medical malpractice claim. After Roberson and Woodall discussed the matter and Roberson advised the husband of the potential implications, the husband decided to dismiss his loss of consortium claim with prejudice. In January 1996, the trial began. Evidence was presented regarding the patient's future medical and care needs, including testimony from an economist concerning the economic value attributable to the patient's Life Care Plan using three different calculations with different life expectancies for the patient of 48 years, 24 years, and 12 years; no attacks were made on the economist's underlying assumptions by the defendants, including costs attributable to respiratory therapy. After six days of trial, a settlement agreement was reached by which the patient was to receive a collective cash payment of $3,325,000 including $600,000 from the physician defendant, $1,900,000 from Memorial Hospital, and $825,000 from Memorial Hospital's excess carrier with all of the defendants agreeing to pay within 72 hours. A provision was also made for the patient's future medical services. Woodall in particular was concerned with the patient's continued care having visited her at the nursing home, where she was housed after her discharge from Memorial Hospital; disapproved of what he believed to be unsanitary conditions; and, after the patient contracted a series of infections, each of which caused her to be returned to Memorial, filed a lawsuit against Memorial seeking to enjoin it from returning her to the nurs-

ing home. The lawsuit was eventually dissolved but as a result of negotiations from that suit, Memorial agreed to place the patient in a better facility. Memorial also agreed to provide certain future medical services to the patient. Initially, Woodall believed that those services would include all of the medical services and/or supplies that were not available at the previous nursing home, including certain daily respiratory therapy and treatments shown in a video which had been presented at trial. After a settlement meeting, Roberson and Woodall discussed the value of the future services to be provided to the patient for the purpose of computing attorney's fees and after agreeing with Roberson that court approval of any valuation would be necessary, Woodall contacted the economist and asked her to compute the value of respiratory therapy for the patient based on a conservative seven-year life expectancy. On that basis, the economist calculated the respiratory expenses to be $1,091,909 and in January 1996, sent her calculation to Woodall who immediately sent it to Roberson. Roberson then valued the services at $1,425,000 in the settlement statement that he provided to the husband and ultimately filed with the court.

During the settlement discussions, the defendants also insisted that the settlement include a release of the patient's four children's inchoate wrongful death claims as well as any potential wrongful death claim of the husband. Although Woodall expressed misgivings about such a release and refused to participate in any probate proceedings that dealt with the children, Roberson and the hospital's counsel had such releases executed and approved by the probate court in July 1996. Roberson also decided to establish a "special needs trust" through which a portion of the settlement funds could be set aside free of Medicare or Medicaid liens if reimbursement was sought for the patient's care and returned a $600,000 check previously tendered by the defendant physician's attorney requesting that it be replaced with two checks, one for $400,000 for the "special needs trust" and one for $200,000 for a trust belonging to the children, which had been created as part of the agreement to release the children's future claims against the defendants. Roberson also requested that the defendant physician's attorney retain the checks until the trusts were set up. Woodall, who understood that the checks were to be issued promptly and sent to Roberson, was not aware of Roberson's request to have the checks held or of the fact that Roberson never funded the trusts and that the checks stayed with the defendant physician's attorney until a new guardian was appointed.

On January 26, 1996, after the settlement was reached, Roberson paid Woodall $1,100,000 from Roberson's trust account for his services — an amount determined by Roberson arbitrarily, although they had agreed that Woodall's fee would essentially be a flat fee

capped at one million dollars irrespective of how much money the patient recovered. At the same time he paid Woodall, Roberson also endorsed the $1,900,000 settlement check from Memorial which was made payable to Roberson, Woodall, and the husband. Although Woodall claimed that he thought the settlement would be presented to the court for approval on the day he received his check or the next day, we conclude that as an experienced trial attorney, Woodall had to know that no court approval had been obtained and that a serious problem existed with regard to the disbursement of funds; and that although Roberson had full responsibility for the disbursement of funds up until the time Woodall received his check, every aspect of the case having to do with the settlement and settlement funds became Woodall's responsibility as well on January 26 as he should have known there was a problem with the settlement, should have investigated further, and was equally responsible with Roberson for obtaining court approval of settlement fund disbursements.

Between January 31, 1996 and February 18, 1996, Roberson issued a check from his trust account payable to the husband, in his individual capacity, in the amount of $151,359.33, initially stating that it was in exchange for the husband's agreement to dismiss his loss of consortium claim, but later stating that it was a guardianship fee; paid the husband's sister $30,000, purportedly for taking care of the patient's children; and, wrote four checks from his trust account to himself totaling $600,000. We note that all of these disbursements could have been prevented if Woodall had sought court approval of the settlement immediately upon receiving his check from Roberson.

Woodall contacted Roberson after he received a complaint from the nursing home on February 20, 1996 regarding an unpaid medical bill and was informed by Roberson that the probate court had approved the settlement and related disbursements on February 16, 1996. However, on March 22, 1996, Woodall received a copy of a letter from the defendant physician's attorney indicating that the settlement documents had not been finalized and immediately contacted Roberson, who informed him that he was having trouble getting some of the documentation straight with the defense attorneys but that he would take care of it. In May 1996 after learning that the settlement documentation still had not been finalized, Woodall wrote to the defense lawyers urging them to speed up the process. Less than one week later, the defendant physician's attorney wrote to Roberson enclosing settlement documents that had been approved by the defense attorneys and asking for Roberson's approval. The attorney, however, did not send a copy of his letter to Woodall. In June 1996, Woodall received a call from Roberson's associate asking him what his understanding was as to what future medical services Memorial had agreed to provide and, after their discus-

sion, the associate sent Woodall a copy of a draft settlement provision, which Woodall reviewed, added a statement to, and returned. Memorial's attorney disagreed with the provision, asserting that the agreement was to provide for more limited services, essentially respiratory care services and a Hill-Rom mattress, and without consulting Woodall, Roberson agreed to Memorial's settlement language. As Roberson did not consult with Woodall about the matter, Woodall continued to believe that the patient was to receive more extensive services. The defendant physician's attorney also contacted Woodall regarding the Schedule of Payments to be attached to the settlement agreement as he was having a difficult time contacting Roberson. At Roberson's request, Woodall arranged with the defense attorneys for the schedule to merely state that attorneys' fees and expenses of litigation would be distributed to Roberson and Woodall "in accordance with the attorney's fee contract and in accordance with law."

On July 1, 1996, the husband signed the settlement documents, which subsequently were filed with the court on July 29, 1996. On July 30, 1996, a hearing was scheduled to approve the settlement. Woodall was not notified of the hearing nor did he inquire as to when it would be held. Roberson, who was notified, sent his associate on his behalf. However, as the associate had no knowledge of the relevant settlement facts, she was unable to satisfactorily respond to the court's questions and the court rescheduled the hearing. Roberson, however, did not attend the rescheduled hearing. In mid-August, Woodall learned about the aborted hearings for the first time and contacted Roberson regarding the delay. After Roberson informed Woodall that he had lost the calculations prepared by the economist, Woodall contacted the economist, who sent him her January 1996 calculations valuing the patient's future services at $1,091,909, and Woodall faxed the information to Roberson. Roberson informed Woodall that he needed figures supporting the $1,425,000 figure he had used for future services in the settlement agreement and Woodall contacted the economist again. Woodall and the economist then attempted to determine on what the $333,091 discrepancy was based and the economist decided that the difference must have represented the cost of anticipated but uncovered hospitalization stays. Woodall sent the new calculations to Roberson, prepared an affidavit for the economist to sign, and submitted the affidavit to the court.

On October 1, 1996, another hearing on the settlement agreement was held. When Woodall produced the economist's affidavit, the hospital's attorney immediately asserted that the figure was exaggerated as it included services that had not been a part of the settlement agreement. Roberson vehemently disagreed with the hospital's counsel, continuing to assert that the settlement included the addi-

tional services and suggesting that pages of the agreement may have been switched without his approval. After the October 1 hearing, Roberson requested that Woodall prepare a complaint against Memorial for breach of the agreement, which Woodall did. After drafting the complaint, however, Woodall recognized that he and Roberson had a potential conflict of interest and the husband retained other counsel to pursue the lawsuit which was eventually dismissed after the patient died. We note that although Woodall could have believed that the higher level of services were provided for in the settlement agreement, he had to know that the entire settlement process was flawed and that as a result of Woodall's ratification of Roberson's misconduct, Roberson and Woodall, by including the valuation for a higher level of services than agreed upon, inflated the gross settlement amount to $4,800,000, thereby attempting to justify their attorneys' fees of $2,400,000 or 50 percent of the settlement proceeds.

On December 31, 1996, the patient died and shortly thereafter, Woodall tendered the sum of $327,000 to the court which represented what Roberson said was the percentage of money paid to Woodall as a result of the valuation of future services in the settlement. Roberson and Woodall subsequently were sued, jointly and severally, by the administrator of the patient's estate for malpractice and related claims in connection with the settlement agreement, and on November 9, 1998, Woodall settled the claim against him for $350,000, obtaining a full release from the administrator and a letter from the administrator's attorney to the State Bar stating that the estate sought no further recovery from Woodall.

Based on the above stated facts, we find no evidence of mitigating factors and conclude that the State Bar proved by clear and convincing evidence that Woodall violated Standards 4, 30, 31 (a), 31 (d) (2), 36, 44, 61, and 63 of Bar Rule 4-102 (d). We agree with the Review Panel that disbarment is the appropriate sanction in this matter. Accordingly, Woodall is disbarred from the practice of law in Georgia. Furthermore, prior to submitting any petition for reinstatement, Woodall shall make full restitution to the estate of all moneys he received in regard to his representation of the estate. He is reminded of his duties under Bar Rule 4-219 (c).

*Disbarred with conditions on reinstatement. All the Justices concur.*

DECIDED FEBRUARY 5, 2001.

William P. Smith III, General Counsel State Bar, Jonathan W. Hewett, Assistant General Counsel State Bar, for State Bar of Georgia.

*Inglesby, Falligant, Horne, Courington & Nash, Sam P. Inglesby, Jr.*, for Woodall.