818 A.2d 1059

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

David ROBERSON.

Misc. Docket AG No. 45, Sept. Term, 2001.

Court of Appeals of Maryland.

March 11, 2003.

Melvin Hirshman, Bar Counsel and Raymond A. Hein, Asst. Bar Counsel for Atty. Grievance Com'n, for petitioner.

David Roberson, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BATTAGLIA, Judge.

This is a reciprocal discipline action arising out of disciplinary proceedings initiated in Georgia, where the Respondent, David Roberson (hereinafter "Roberson" or "Respondent"), a member of that bar, exclusively practiced law.[1] Respondent was disbarred from the practice of law in Georgia on April 5, 2001,[2] when the Supreme Court of Georgia determined, after

---

1. Respondent was admitted to the bar of this Court in December 30, 1976, and on April 13, 1999, he was decertified, and has remained so, for nonpayment of the annual assessment by the Client Protection Fund, formerly known as Client Security Trust Fund. The decertification does not affect the Court's authority to consider reciprocal discipline because we have held that an attorney "who has been admitted to the bar of the State and has not tendered a resignation remains subject to the disciplinary authority of this Court, notwithstanding being on the inactive list of attorneys, by virtue of failure to pay the Client Security Trust Fund assessment." *Attorney Grievance Comm'n v. Ruffin,* 369 Md. 238, 252, 798 A.2d 1139, 1147 (2002).

2. Reinstatement was conditioned upon "Roberson ... mak[ing] full restitution to the estate involved of all moneys he received in regard to his representation of the estate."

the Review Panel of the State Disciplinary Board recommended disbarment, that Roberson had violated the following Georgia State Bar Standards: 4 (a lawyer shall not engage in professional conduct involving dishonesty, fraud, deceit, or wilful misrepresentation); 30 (except with the written consent of or written notice to his client after full disclosure a lawyer shall not accept or continue employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property or personal interests); 31(a)(a lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee); 31(d)(2)(upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the following: (i) the outcome of the matter; and (ii) if there is a recovery: (aa) the remittance to the client; (bb) the method of its determination; (cc) the amount of the attorney fee; and (dd) if the attorney's fee is divided with another lawyer who is not a partner in or an associate of the lawyer's firm or law office, the amount of fee received by each and the manner in which the division is determined); 36 (a lawyer shall not continue multiple employment if the exercise of his independent professional judgment on behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under Standard 37); 44 (a lawyer shall not without just cause to the detriment of his client in effect wilfully abandon or wilfully disregard a legal matter entrusted to him); 61 (a lawyer shall promptly notify a client of the receipt of his funds, securities or other properties and shall promptly deliver such funds, securities or other properties to the client); 63 (a lawyer shall maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and promptly render appropriate accounts to his client regarding them); and 65(A)(a lawyer shall not commingle his client's funds with his own, and shall not fail to account for trust property, including money and interest paid on the client's money, if any, held in any fiduciary capacity) of Bar Rule 4-102(d).

The Supreme Court of Georgia disbarred Respondent after having concluded that the Respondent violated these Standards while providing representation in a medical malpractice action filed on behalf of a woman who slipped into a coma after complications arose during a routine Caesarian section performed after Roberson had been retained by the woman's common law husband in August of 1994. *In re Roberson,* 273 Ga. 651, 544 S.E.2d 715 (2001).

On January 10, 2002, the Attorney Grievance Commission of Maryland (hereinafter "Bar Counsel"), acting pursuant to Rules 16–751 [3] and 16–773 [4] of the Maryland Rules, filed a

---

**3.** Maryland Rule 16-751 provides in part:

(a) Commencement of disciplinary or remedial action. Upon approval of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.

**4.** Maryland Rule 16-773 provides:

(a) Duty of attorney. An attorney who in another jurisdiction (1) is disbarred, suspended, or otherwise disciplined, (2) resigns from the bar while disciplinary or remedial action is threatened or pending in that jurisdiction, or (3) is placed on inactive status based on incapacity shall inform Bar Counsel promptly of the discipline, resignation, or inactive status.

(b) Duty of Bar Counsel. Upon receiving information from any source that in another jurisdiction an attorney has been disciplined or placed on inactive status based on incapacity, Bar Counsel shall obtain a certified copy of the disciplinary or remedial order and file it with a Petition for Disciplinary or Remedial Action in the Court of Appeals pursuant to Rule 16–751, and shall serve copies of the petition and order upon the attorney in accordance with Rule 16–753.

(c) Show cause order. When a petition and certified copy of a disciplinary or remedial order have been filed, the Court of Appeals shall order that Bar Counsel and the attorney, within 15 days from the date of the order, show cause in writing based upon any of the grounds set forth in section (e) of this Rule why corresponding discipline or inactive status should not be imposed.

(d) Temporary suspension of attorney. When the petition and disciplinary or remedial order demonstrate that an attorney has been disbarred or is currently suspended from practice by final order of a court in another jurisdiction, the Court of Appeals may enter an order, effective immediately, suspending the attorney from the practice of law, pending further order of Court. The provisions of Rule 16–760 apply to an order suspending an attorney under this section.

Petition for Disciplinary or Remedial Action against Roberson to which a certified copy of the Georgia Supreme Court's disciplinary order was attached. In the Petition, Bar Counsel alleged that Respondent is subject to the disciplinary authority of this State pursuant to Maryland Rule of Professional Conduct (hereinafter "MRPC") 8.5(a).[5] In addition, Bar Counsel charged Respondent with engaging in misconduct as

(e) Exceptional circumstances. Reciprocal discipline shall not be ordered if Bar Counsel or the attorney demonstrates by clear and convincing evidence that:
(1) the procedure was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process;
(2) there was such infirmity of proof establishing the misconduct as to give rise to a clear conviction that the Court, consistent with its duty, cannot accept as final the determination of misconduct;
(3) the imposition of corresponding discipline would result in grave injustice;
(4) the conduct established does not constitute misconduct in this State or it warrants substantially different discipline in this State; or
(5) the reason for inactive status no longer exists.
(f) Action by Court of Appeals. Upon consideration of the petition and any answer to the order to show cause, the Court of Appeals may immediately impose corresponding discipline or inactive status, may enter an order designating a judge pursuant to Rule 16–752 to hold a hearing in accordance with Rule 16–757, or may enter any other appropriate order. The provisions of Rule 16–760 apply to an order under this section that disbars or suspends an attorney or that places the attorney on inactive status.
(g) Conclusive effect of adjudication. Except as provided in subsections (e)(1) and (e)(2) of this Rule, a final adjudication in a disciplinary or remedial proceeding by another court, agency, or tribunal that an attorney has been guilty of professional misconduct or is incapacitated is conclusive evidence of that misconduct or incapacity in any proceeding under this Chapter. The introduction of such evidence does not preclude the Commission or Bar Counsel from introducing additional evidence or preclude the attorney from introducing evidence or otherwise showing cause why no discipline or lesser discipline should be imposed.
(h) Effect of stay in other jurisdiction. If the other jurisdiction has stayed the discipline or inactive status, any proceedings under this Rule shall be deferred until the stay is no longer operative and the discipline or inactive status becomes effective.
5. MRPC 8.5(a) states:
(a) A lawyer admitted by the Court of Appeals to practice in this State is subject to the disciplinary authority of this State for a violation of these rules in this or any other jurisdiction.

defined in Maryland Rule 16–701(i) [6] and with violating the Maryland counterparts of the Georgia State Bar Standards he had been found to have violated, and more specifically, MRPC 8.4 (Misconduct),[7] MRPC 1.5 (Fees),[8] MRPC 1.7 (Conflict of

---

**6.** Maryland Rule 16–701(i) states:
(i) Professional misconduct. "Professional misconduct" or "misconduct" has the meaning set forth in Rule 8.4 of the Maryland Rules of Professional Conduct, as adopted by Rule 16–812. The term includes the knowing failure to respond to a request for information authorized by this Chapter without asserting, in writing, a privilege or other basis for such failure.

**7.** MRPC 8.4 provides in relevant part:
It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
\* \* \*
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation. . . .

**8.** MRPC 1.5 provides:
(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent.
(b) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.
(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. The terms of a contingent fee agreement shall be communicated to the client in writing. The communication shall state the method by which the fee is to be

Interest: General Rule),[9] and MRPC 1.15 (Safekeeping Property).[10]

---

determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination.

(d) A lawyer shall not enter into an arrangement for, charge, or collect:

(1) any fee in a domestic relations matter, the payment or amount of which is contingent upon the securing of a divorce or custody of a child or upon the amount of alimony or support or property settlement, or upon the amount of an award pursuant to Sections 8–201 through 213 of Family Law Article, Annotated Code of Maryland; or

(2) a contingent fee for representing a defendant in a criminal matter.

(e) A division of fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;

(2) the client is advised of and does not object to the participation of all the lawyers involved; and

(3) the total fee is reasonable.

9. MRPC 1.7 provides:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation.

(c) The consultation required by paragraphs (a) and (b) shall include explanation of the implications of the common representation and any limitations resulting from the lawyer's responsibilities to another, or from the lawyer's own interests, as well as the advantages and risks involved.

10. MRPC 1.15 provides:

On May 9, 2002, we referred the case to the Honorable Philip Caroom of the Circuit Court for Anne Arundel County for a hearing.[11] Following the hearing on August 14, 2002, during which the parties submitted an "extensive statement" of "Stipulated Facts and Exhibits" and additional agreed exhibits, the hearing court made findings of fact, as follows:

## I. *Findings of Fact*

### A. *Procedural history*

Based on the stipulations and agreed exhibits, the undersigned finds the following facts:

1. Roberson was admitted to practice law in Maryland by the Court of Appeals on December 30, 1976. He was appointed as an Assistant U.S. Attorney for the Southern District of Georgia on January 3, 1978 and was admitted

---

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

11. On January 11, 2002, this Court issued a show cause order directing Respondent to show cause why corresponding discipline should not be imposed in Maryland to which Respondent, after service and receipt of an extension, responded on May 2, 2002. The Court immediately suspended Respondent from the practice of law on May 8, 2002, subject to further order.

to the State Bar of Georgia on November 7, 1979.[1] Roberson subsequently entered private practice in Georgia.

2. Prior to the present proceedings, Roberson never has been subject to any disciplinary proceedings in either Maryland or Georgia. He was decertified on April 13, 1999, by Maryland, however, for nonpayment of his annual Clients' Security Trust Fund assessment.

3. The State Bar of Georgia initiated an investigation of Roberson on February 21, 1997, and filed its Formal Complaint ("the complaint") against Roberson on December 31, 1997, alleging nine (9) serious violations of the standards set by Georgia's Bar Rules, seeking appropriate discipline and reimbursement of fees. Joint Exhibit B, pp. 6 through 33. All alleged violations related directly or indirectly to representation of the late Julia Mae Shiggs[2] and her husband, initially in a medical malpractice claim between April 1995 and October 1996.

4. The Supreme Court of Georgia ("the Court"), in the interim between the investigation's initiation and the complaint's filing, by administrative Order of June 13, 1997 and effective July 1, 1997, changed the standard of proof for attorneys' disciplinary cases from "beyond a reasonable doubt" to "clear and convincing evidence." Amended Georgia Bar Rule 4–221(e)(2); joint exhibit.

5. On June 13, 1997, the Court also amended the Georgia Bar Rules, establishing the system of special master's trials, followed by a Review Panel; then, "[a]lleged errors in the trial may be reviewed by the [Georgia] Supreme Court when the findings and recommendation of the Review Panel are filed with the Court." Amended Georgia Bar Rule 4–213(a); joint exhibit 5. The latter amendment, removing the right to a jury trial, also superseded state legislation which had provided jury trials for disbarment actions. [Official Code of Georgia Annotated], sec. 15–19–32; see joint exhibits 4 and 4A.

[1] The State Bar of Georgia in its Formal Complaint alleged that Roberson was admitted in 1973, but this appears to have been a clerical error and is immaterial to the present concerns.

6. The Supreme Court of Georgia, as provided by these amended rules, appointed a Special Master to take testimony as to this matter on November 24, 1998. The Special Master held a hearing in the matter between April 19 and 22, 1999. Joint exhibits 6A through 6D.

7. The Special Master filed his 54–page report of facts and recommendations for discipline on March 27, 2000. This included the determination that the newly-adopted standard of proof as to "clear and convincing evidence" should be applied, rather than the earlier standard of "beyond a reasonable doubt." Joint exhibit B, pp. 484–537. The Special Master found that Roberson committed all nine (9) alleged ethical violations, recommending disbarment, a public reprimand and restitution of attorney's fees received.

8. The Report of the Review Panel, relying on the Special Master's Report, was filed July 17, 2000. Joint exhibit B, pp. 726–729. With one exception,[3] the Review Panel approved all findings and recommendations of the Special Master.

9. The Supreme Court of Georgia, in its April 5, 2001, per curiam opinion, also approved the findings that Roberson had committed all nine (9) alleged violations by "clear and convincing evidence,"[1] ruling that disbarment was the appropriate sanction and requiring "full restitution" before any petition for reinstatement. Joint exhibit C.

10. The specific facts of the representation, as found by the Special Master and approved by the Georgia Supreme Court, are not disputed by

[2] Shiggs was comatose at the outset of the litigation and died in December 1996.

[3] The one exception noted that the Special Master had found that Roberson "more likely" inflated estimated future medical needs for his client by over $300,000 from $1,091,909—a figure supplied via econo-

mist Dr. Barbara Bart—to $125,000—a figure for which the Special Master found inadequate support. Joint Exhibit B, pp. 496–497 and 727. The nine member Review Panel, nevertheless, voted 8–0 with one abstention to accept the Special Master's findings and recommendations. The "more likely" issue is discussed further, infra.

Roberson in these Maryland disciplinary proceedings.[5] These may be summarized as follows:

B.  *Facts of representation*

In August 1994, Julia Mae Shiggs ("Shiggs"), a 34 year old woman, was admitted to Savannah's Memorial Medical Center ("the hospital") to give birth to her fourth child. Ms. Shiggs experienced complications during a Caesarian section and slipped into a coma from which she never awoke.[6]  SMR2 [Special Master's Report].

Shortly thereafter, Michael Mydell ("Mydell"), Ms. Shiggs' common-law husband, contacted Roberson to file a medical malpractice suit on behalf of Ms. Shiggs and a loss of consortium claim for himself.  Special Master Report ("SMR") 2–3.[7]  An Authority to Represent agreement (the "fee agreement") was executed on September 28, 1994, in which Mydell retained the services of Roberson for a 40% contingent fee.

Roberson, in November 1995, with the permission of Mydell, hired John Thomas Woodall ("Woodall"), another experienced trial attorney to assist

---

[4]  The Court's opinion made reference to the Special Master's findings without remarking on the "more likely" language.

[5]  Roberson's Memorandum of Law points to no specific facts disputed, but makes the conclusory allegation in the language of Maryland Rule 16–773(e)(2) that there has been "such infirmity of proof establishing the misconduct as to give rise to a clear conviction that the Court, consistent with its duty, cannot accept as final the determination of misconduct."

[6]  All references are to the per curiam opinion of the Supreme Court of Georgia (joint exhibit C), unless otherwise indicated.

[7]  The findings of fact by the undersigned refer to the Special Master's report's findings, incorporating by reference the more specific references to trial transcript pages and exhibits therein.  While the entire Special Master's trial transcript was not filed herein, the parties stipulated to excerpts of passages they considered most material, which form part of the record as supplemental exhibits no. 6A through 6D.

with the litigation. However, Roberson and Woodall did not execute a written agreement as to attorney's fees. Instead, they had a "gentleman's agreement" according to Roberson and shook hands. SMR 5. Woodall, it was understood, would have no personal contact with Roberson's clients and would receive instructions only from Roberson.

Roberson and Woodall filed suit on April 14, 1995 and alleged counts for medical malpractice and loss of consortium. SMR 5. However, in September 1995, Roberson informed Mydell that the case expenses were escalating and he needed to contribute $10,000 to the costs of prosecuting the claims. SMR 6. Mydell and Roberson then agreed to amend their Fee Agreement when Mydell could not pay the $10,000. SMR 6. The new contract between Mydell and Roberson on September 1, 1995, required that Roberson receive 50% of the proceeds of any recovery in the case. SMR 6.

On the eve of trial after learning that Mydell had impregnated another women while his wife was still in a coma, Roberson decided that the loss of consortium claim could adversely impact Ms. Shiggs' medical malpractice claim. Mydell subsequently agreed to dismiss his loss of consortium claim after discussing this matter with Roberson. SMR 7.

The trial began on January 16, 1996, and ended after six (6) days with a settlement agreement on January 22, 1996. The settlement agreement consisted of a collective cash payment of $3, 325,000 to be paid by defendants within 72 hours to Roberson for Ms. Shiggs' benefit. Importantly, the settlement agreement involved the participation of trial judge Gregory Fowler: Roberson agreed that **"court approval of any valuation [of services provided in addition to the monetary payments] would be necessary."** SMR10 & 12; emphasis in original.

Also, as part of the settlement agreement, the defendants insisted that Mydell's and all Ms. Shiggs' four children's inchoate wrongful death claims be released. SMR 14. Despite Mydell's stated misgivings and refusal to participate,

Roberson agreed and arranged the releases of the children's claims, obtaining the local Probate Court's approval for this in July 1996. SMR 14–15.

Further supplementing the monetary aspects of the settlement agreement, the hospital agreed to provide certain future medical services to Ms. Shiggs. SMR 12. This would include all aspects of Ms. Shiggs' care, including certain daily respiratory therapy & treatment. A value of these future services was required, in part, for the purpose of determining attorneys' fees. SMR 12. The value of future services—of respiratory treatment only—had been calculated for trial by Dr. Bart to be $1,091,909, based on the present value of seven year's worth of respiratory expenses. SMR 13.[8] This information was provided on January 23, 1996, by Woodall[9] to Roberson.

Roberson, nevertheless, valued the future medical services in his submission to the trial court at $1,425,000, using this figure in the Settlement Statement which he presented to Mydell and filed with the Court. SMR 13–14.[10] Later in August 1996, when Roberson was asked for his documentation of the $1,425,000 figure, Roberson: a) told Woodall that he (Roberson) "had lost the papers" with the $1,425,000 figure; b) contended that $1,425,000, not $1,091,909, was the figure that Woodall supplied and c) suggested to the trial judge that the pages may have been switched without his consent. SMR 13, 30 and 33.

To the contrary, Woodall testified, as to the August conversation with Roberson,

> This is the first time in my life I had heard of $1,425,000. I knew that I had only faxed him on January whatever it was in 1996, I had only faxed him a figure for respiratory therapy that was $1,091,000, and I did not know what the difference was either." SMR 30.

Woodall got the impression from talking with Roberson that Roberson received the increased figure directly from Dr. Bart; however, when Woodall

8 Although Ms. Shiggs' own neurologist testified that she could be expected to live as long as 48 years, Woodall and Dr. Bart chose a seven year period for calculating future services because they believed it was a more reasonable and conservative figure. SMR 13; Tr. 517, 1140–41.

9 Woodall, by agreement with Roberson, acted as primary trial attorney apparently with the responsibility of gathering documentary evidence for trial. SMR 5.

10 In his submission to the probate court, Roberson made no reference to the provision of future medical care. SMR 22.

asked her, Dr. Bart informed Woodall that she had no other calculations and had done none for Roberson directly. SMR 31.

Knowing that the larger figure was necessary to justify the amount of attorney's fees already distributed from the settlement proceeds, Woodall[11] on behalf of himself and Roberson asked Dr. Bart to sign an affidavit which made up the approximately $300,000 difference between the future medical care figures by assuming the need for additional hospital stays, if she was "comfortable" with this. SMR 31.

The Special Master also considered testimony as to the source of the $1,425,000 calculation from Karen Alston, a paralegal formally employed by Roberson. However, he rejected Ms. Alston's testimony as inconsistent and containing too many "memory gaps." For example, Alston testified both 1) that Roberson was her source of the $1,425,000 figure, which he wrote for her on a scrap of paper and 2) that Woodall was her source of the figure, which he "had to tell her how to write." SMR 13–14, note 7.

Roberson complains that the Special Master found it "more likely" that the increase between the $1,091,909 future medical bill and the $1,425,000 was added on by Roberson, arguing that this phrase indicates the Master applied a mere "preponderance" standard of proof rather than the more stringent and legally required "clear and convincing" standard. SMR 13. However, the undersigned finds that the "more likely" reference has been taken out of context and misconstrued. In context, the undersigned finds that Special Master infelicitously used this phrase

simply to indicate that he gave no credibility to Roberson's alternate explanations of how the $300,000 discrepancy arose. Upon summarizing the entirety of the evidence on this point, it is plain that the Special Master found clear and convincing evidence that Roberson had violated professional standards by "maintaining dishonest, fraudulent, and deceitful records of the settlement ... which contained willful misrepresentations." SMR 38–42. Notably, the Georgia Review Panel approved the Special Master's report, excepting and disagreeing that the evidence on this point was simply "more likely"; instead, the Review Panel found "the evidence is clear and convincing that Respondent Roberson increased the amount of future medical services from $1,091,000 to $1,425,000 in order to enlarge the

---

[11] Woodall also was subject to disciplinary proceedings in Georgia. SMR 1.

amount of attorneys' fees claimed. . . ." Joint Exhibit B, p. 727. The Georgia Supreme Court in its per curiam opinion, affirmed the Review Board's "clear and convincing" evidence finding and made no reference to the Special Master's "more likely" language. Joint Exhibit C.

C. *Disbursements*

During the settlement discussions, Roberson decided to establish a "special needs trust" where a portion of the settlement funds could be set aside free of Medicare or Medicaid liens. As a result, Roberson returned a $600,000 check received from the defendant doctor to his attorney, Greg Hodges, and had it replaced with two checks: (1) a $400,000 check for the special needs trust; and (2) a $200,000 check for the trust belonging to Ms. Shiggs' children.[12]

Roberson had Hodges retain the checks until the trusts were set up and could be funded, but Roberson never had the trusts funded and they remained in Hodges' drawer until a new guardian was appointed. SMR 16.

After the settlement was completed, Roberson paid Woodall $1,100,000 on January 26, 1996, which was paid from

settlement funds held in trust prior to court approval of the settlement. SMR 18–19. This payment was made, despite Roberson's prior oral agreement with Woodall on a "flat fee" of $1,000,000 for Woodall's services, irrespective of the amount recovered.

On February 26, 1996, Roberson issued a check from his trust account to Mydell in the amount of $151,359.33. Tr. 135–37.[13] Roberson also did not seek court approval prior to making this disbursement to Mydell. SMR 20.

Further, Roberson made a payment from his trust account on February 16, 1996, in the amount of $30,000 to Mydell's sister Ms. Loretta Barnes ("Barnes") for the estimated value of her care of Ms. Shiggs' four children. This payment also was made before the probate court approved the disbursement. SMR 21.

---

[12] This trust was to be created as a part of the agreement where the children would release any potential claims against the defendants.

In addition, Roberson wrote four checks to himself from his trust account totaling $600,000 between January 31, 1996 and February 18, 1996. SMR 21.[14] Roberson also wrote four additional checks totaling $633,112 as payment for the purchase of a church.[15] *Id.* Again, all these checks written by Roberson to himself were made without court approval. SMR 22.

Based [on] his aforementioned increase in the figure for future medical fees, Roberson increased the amount of contingent attorney's fee claimed from one-half of the cash settlement of $3,325,000—i.e., $1,662,500—to one-half the larger settlement $4,750,000—i.e., over $2,000,000 total.

Eventually, Roberson and Woodall were sued by the administrator of Ms. Shiggs' estate for legal malpractice and other claims related to the settlement agreement. Woodall settled the claim against him obtaining a full release for payment of $350,000. Roberson, after the disbarment order of the Georgia Supreme Court, settled the estate's claim against him with payment of $449,385.26. Stipulated Facts and Exhibits, esp. exhibit 19 dismissal, dated April 19, 1999.

## II. *Conclusions of Law*

The undersigned finds that the Georgia disciplinary proceedings have satisfied the requirements of Maryland Rule 16 773, which provides that "a final adjudication in a disciplinary ... proceeding by another court ... that an

---

[13] The reason for this payment by Roberson has varied. On October 1, 1996, Roberson told Judge Fowler that the payment was in exchange for Mydell's agreement to dismiss his loss of consortium claim. SMR 15. However, at a later hearing, Roberson stated that the payment represented a "guardianship fee." SMR 20.

[14] The Special Master also noted that Roberson made inconsistent statements as to the use of the latter funds at two different court hearings. SMR 21.

[15] Roberson is a minister as well as an attorney. Despite an earlier invocation of 5th Amendment rights in this regard, he admitted at the Special Master's hearing that he "donated" this portion of his fees to purchase the Bull Street Church of Christ in Chatham Co., Georgia. SMR 4 & 21.

attorney has been guilty of professional misconduct ... is conclusive evidence of that misconduct in any [Maryland] proceeding ... [unless the other court's adjudication] was so lacking in notice or the opportunity to be heard as to constitute a deprivation of due process ... [or] there was such an infirmity of proof establishing the misconduct as to give rise to a clear conviction that the Court ... cannot accept as final the determination of misconduct. Maryland Rule 16–773(e)(*l* ), (e)(2), and (g).

## A. *Due Process issues*

Roberson's two complaints as to his due process rights relate to the denial of: 1) his motion for application of the superseded, stricter standard of proof; and 2) his belated [16] demand for a jury trial, also superseded by the amended Georgia Bar Rule.

Initially, the undersigned notes that Maryland Rule 16–773 does *not* reference the full gamut of due process issues, but rather limits challenges of out-of-state proceedings to "notice" and "opportunity to be heard." There has been no contention that Roberson lacked notice. And, the undersigned finds that he clearly had the opportunity to be heard

at three court levels: the Special Master's hearing, the Review Board proceeding and the appeal to the Georgia Supreme Court.

In effect, Roberson asserts that a "due process" opportunity to be heard requires a jury trial for attorney disciplinary proceedings. To the contrary, Maryland's Court of Appeals has agreed with the Georgia Supreme Court decision herein that, while attorney disciplinary matters require basic due process protections, such rights are not coextensive with the rights of criminal defendants: neither findings "beyond a reasonable doubt," nor jury trial are required See, as to jury trials, *Attorney Grievance Commission v. Kerpelman,* 288 Md. 341, 420 A.2d 940 (1980), cert. den. 450 U.S. 970, 101 S.Ct. 1492, 67 L.Ed.2d 621 (1981); see, as to comparison with criminal proceedings, *Maryland State Bar Association v. Sugarman,* 273 Md. 306, at 315, 329 A.2d 1(1974), cert. den. 420 U.S. 974, 95 S.Ct. 1397, 43 L.Ed.2d 654 (1975).

---

[16] Roberson's Motion for Jury Trial and for Reconsideration was filed with the Supreme Court of Georgia only on February 14,2001, after the conclusion of both the Special Master's and Review Panel's proceedings. The Court denied this motion. Stipulated Facts and Exhibits herein, paragraphs 14 through 17.

Roberson also suggests that the Georgia Supreme Court erred by changing the procedural rights to which he was entitled by legislation and prior rule after the alleged misconduct but before the filing of court action against him. The inherent authority of Georgia's Supreme Court to regulate the practice of law and the disciplinary proceedings as to lawyers has been found properly to supersede the efforts of the state legislature in this area. As with other constitutional challenges to the courts' authority to regulate attorneys, the U.S. Supreme Court has declined to intervene in such matters. *Wallace v. Wallace,* 225 Ga. 102, 166 S.E.2d 718, cert. den. 396 U.S. 939, 90 S.Ct. 369, 24 L.Ed.2d 240 (1969). This construction of the courts' disciplinary authority is identical to the Maryland Court of Appeal's interpretation of its own authority. Cf., Annotated Code of Maryland,

Courts and Judicial Proceedings Art., sec. 1–201 and *Petite v. Estate of Papachrist*, 219 Md. 173, 148 A.2d 377 (1959).

B. *Application of standards as to professional misconduct*

Based on the factual findings discussed, supra, the undersigned has found no "infirmity of proof establishing the misconduct as to give rise to a clear conviction that the Court ... cannot accept as final the determination of misconduct." Maryland Rule 16–773.

Following is a discussion of specific violations of Georgia Bar Rules: [17]

---

[17] As noted above, the undersigned has found that Georgia and Maryland share substantially similar standards for attorneys' professional conduct. For ease of comparison, an appendix is attached and incorporated by reference herein which charts the two states' standards of professional conduct. [The referenced appendix reflects the following:]

## APPENDIX

| Corresponding Count | Maryland Rule | Georgia Standard |
|---|---|---|
| **Count I - Conduct Involving Dishonesty** | **Rule 8.4 Misconduct** It is professional misconduct for a lawyer to: (a) violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through acts of another * * * (c) engage in conduct involving fraud, deceit, or misrepresentation | **Standard 4** A lawyer shall not engage in professional conduct involving dishonesty, fraud deceit, or willful misrepresentation. A violation of this Standard may be punished by disbarment. |
| **Count II - Conflict of Interest** **Count V - Multiple Employment Impairing Professional Judgment** **Count VI- Willfully Disregarding a Legal Matter Entrusted by Client** | **Rule 1.7 Conflict of Interest** (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client unless: (1) the lawyer believes the representation will not adversely affect the relationship with the other client; and (2) each client consents after consultation. (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or third person, or by the lawyer's own interests unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation. (c) The consultation required by paragraphs (a) and (b) shall include explanation of the implications of the common representation and any limitations resulting from the lawyer's responsibilities to another, or from the lawyer's own interests, as well as the advantages and risks involved. | **Georgia Standard 30** Except with the written consent or written notice to his client after full disclosure a lawyer shall not accept or continue employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property or personal interests. A violation of this Standard may be punished by disbarment. **Georgia Standard 36** A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under Standard 37. A violation of this Standard may be punished by disbarment. |

| Count III - Clearly Excessive Fees | Rule 1.5(a) Fees | Standard 31(a) |
|---|---|---|
| | (a) A lawyer's fee shall be reasonable. The factors to be considered in determining reasonableness include the following: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitation imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent. | A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee. |

| Count IV- Contingent Fee Shared Improperly with Another Lawyer | Rule 1.5(c) Fees · | Standard 31(d)(2) |
|---|---|---|
| | (i) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. The terms of a contingent fee agreement shall be communicated to the client in writing. The communication shall state the method by which the fee is to be determined, including the percent or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and if there is a recovery, showing the remittance to the client and the method of its determination. | (2) Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the following: (i) the outcome of the matter; and (ii) if there is a recovery: (aa) the remittance to the client; (bb) the method of its determination; (cc) the amount of the attorney fee; and (dd) if the attorney's fee is divided with another lawyer who is not a partner in or an associate of the lawyer's firm or law office, the amount of fee received by each and the manner in which the division is determined. |

| Count VII - Promptly Notifying Client of Receipt of Funds | Rule 1.15 Safekeeping Property | Standard 63 |
|---|---|---|
| **Count VIII - Maintain Complete Record of Client's Funds**<br><br>**Count IX - Not Accounting for All Trust Funds** | (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.<br><br>(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property. | A lawyer shall maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and promptly render appropriate accounts to his client regarding them. A violation of this Standard may be punished by disbarment.<br>**Standard 65(A)**<br>A lawyer shall not commingle his client's funds with his own, and shall not fail to account for trust property, including money and interest paid on the client's money, if any, held in any fiduciary capacity. |

## Count I-conduct involving dishonesty, fraud, deceit, or wilful misrepresentation(Georgia Bar Standard 4)

On this point, the Special Master's report stated "As to [two points] only, the record is devoid of clear and convincing evidence of any violation by Roberson as a matter of law." SMR 39. Phrased in the positive, the Special Master found clear and convincing evidence on various points as to unprofessional conduct involving dishonesty, fraud, deceit or wilful misrepresentation as to:

a) representing to client Mydell that the [actual] value of future medical services for Ms. Shiggs was $1,425,000 [despite absence of any documentation or specific evidence of this];

b) representing to the Chatham County Probate and State courts that the value of future medical services was $1,425,000 [despite absence of any documentation or specific evidence of this];

c) providing false and misleading assumptions to [economist] Dr. Bart [for use in an affidavit as to estimated future medical expenses]; and

d) paying [Mydell and his sister] money belonging to Ms. Shiggs [while not properly disclosing the basis for such payments for the courts' approval]. SMR 20–21, 38–42.

## Count II-conflict of Interest—(Georgia Bar Standard 30)

Related to the inflation of future medical bills, the Special Master found that Roberson failed to disclose a conflict of interest when he did not tell his client that this valuation question might result in an increase of counsel fees in Roberson's interest and to the detriment of the client. SMR 43–44.

## Count III-clearly excessive fee—(Georgia Bar Standard 31.a.)

The initial contingent fee was increased from 40% to 50% of all amounts recovered. With the inclusion of future medical services' valuation, which were not yet provided, the attorneys' fee share of actual cash again was boosted to 72%. SMR 44–45.

The Georgia Supreme Court found that this percent was excessive and Maryland similarly has held this level of contingency fee generally is excessive. The Court of Appeals has stated that "it is generally a violation of the rule for the attorney's stake in the result to exceed the client's stake." *Attorney Grievance Comm'n of Maryland v. Korotki*, 318 Md. 646, 649, 569 A.2d 1224, 1226 (1990).

## Count IV-contingent fee shared improperly with another lawyer-(Georgia Bar Standard 31.d.)

The Georgia standard, like the Maryland rule, as to disclosure of contingent fee arrangements with other counsel, required a written statement to be provided to the client of all details. This was not done. SMR 45–46.

## Count V-multiple employment impairing professional judgment-(Georgia Bar Standard 36)

Roberson provided multiple representation in this case by concurrent representation of: Ms. Shiggs, her common law

husband Mydell-both individually and as Ms. Shiggs' guardian, as well as Ms. Shiggs' children, although there was no written agreement as to representation or attorney's fees as to the children. SMR 46–49; Stipulation, pp. 529–531.

It is clear that Roberson's professional judgment was impaired in this multiple representation context in that: 1) he paid Mydell and his sister a portion of these settlement funds without prior court authorization, and 2) he failed to complete arrangements agreed upon to deposit a portion of settlement funds into trust for benefit of the children. *Id.* The lack of court authorization of payments to Mydell and his sister is significant in that there was no showing required that the amounts of these-payments were proportional to any actual services rendered, rather than being an arbitrary amount which would serve to dissuade these witnesses from raising questions about any other settlement issue. SMR 41, 49 and 52.

### Count VI-wilfully disregarding a legal matter entrusted by client—(Georgia Bar Standard 44)

During settlement discussions with defendants' counsel, Roberson decided to ask that a "special needs" trust be established for benefit of Ms. Shiggs' children to avoid Medicare or Medicaid liens. For this reason, Roberson returned a $600,000 settlement check received from the defendant doctor to his attorney, Greg Hodges, and had it replaced with two checks: 1) a $400,000 check for the special needs trust; and 2) a $200,000 check for the trust belonging to Ms. Shiggs' children.[18] Roberson had Hodges retain the checks until the trusts were set up and could be funded (Tr. 424–25), but Roberson never had the trusts funded and they remained in Hodges' drawer until a new guardian was appointed. SMR 16. This clearly constituted abandonment of a matter for which Roberson has assumed responsibility. SMR 48–50.

---

[18] This trust was to be created as a part of the agreement where the children would release any potential claims against the defendants.

**Count VII-failure to promptly notify and deliver to the client funds received for her—(Georgia Bar Standard 61)**

Roberson clearly violated this standard by: 1) failure to deposit the $600,000 funds left in the hands of the defendant doctor's attorney, 2) improper payment of the client's settlement funds to Mydell and his sister, and 3) the excessive counsel fees taken by Roberson himself and his co-counsel Woodall. SMR 50.

**Count VIII-failure to maintain complete record of client's funds—(Georgia Bar Standard 63)**

Roberson, beyond the original Settlement Statement, kept no records of funds' receipt and disbursement other than bank statements and cancelled checks. As found by the Special Master, "it is impossible to tell [from these bank records] how much money Roberson received on [the client's] behalf and where it all went." SMR 51. The settlement statement falsely reflected that Roberson received the $600,000 on behalf of the children, as he actually returned these funds, and that Roberson paid an attorney $15,000 to set up the children's trust, as he never actually made this payment. SMR 52.

**Count IX-not accounting for all trust funds—(Georgia Bar Standard 65.a.)**

Roberson provided no accounting to Ms. Shiggs or her guardian for the settlement funds which he, as her attorney, held in trust. SMR 53.

III. *Mitigation*

Initially, the undersigned notes that little attention was paid to mitigation in the Georgia proceedings herein. Both the Special Master and the Georgia Supreme Court refer to "non mitigating factors" based upon "the facts found." The "facts found" all relate to the specifics as to the occurrence of the disciplinary infractions. SMR 53; Joint Exhibit C, p. 9.

Maryland has a somewhat broader view of mitigation, which may include an attorney's lack of prior record and his community involvement. E.g., *Attorney Grievance Com-*

*mission v. Bereano,* 357 Md. 321, 744 A.2d 35 (2000). Maryland Rule 16–757(b) permits an attorney in a disciplinary proceeding to provide proof of mitigating facts by a preponderance of evidence.

Here, the undersigned finds the following mitigating evidence: Roberson is an attorney who practiced for nearly 25 years without a prior report of professional misconduct. This career has included public service as a federal prosecutor, as a volunteer attorney in Georgia's Pro Bono Project, and as a Continuing Legal Education faculty member. He has received honors and recognition from the NAACP, Savannah State College (now Savannah State University), the Savannah Legal Secretaries' Association, and other organizations. He has donated little league football uniforms and offered $35,000 initial funding for a scholarship endowment. Joint Exhibit A.

Of particular significance to this case, Roberson now has completed a settlement as to restitution claims of his late client's estate with a payment of $449, 385.26 and the estate has released its claims against him. *Id.,* exhibits 17–19.

Kimberly Copeland, Esq., appeared at the Maryland hearing, testifying that she is a member of the Georgia bar and is president-elect of the Georgia Alliance of African American Attorneys. In addition to praising Roberson for his good character and his reputation as "an outstanding attorney," Ms. Copeland reported statistics as to a disparity of Georgia attorney disciplinary proceedings against African–American attorneys. She related that, of approximately 28,000 attorneys admitted to practice in the state, only about 1,500 or 5% are African–Americans. Despite this, she reported that 30% of those disbarred are African–Americans—that is, six times the rate for other attorneys.

Finally, the undersigned notes that Respondent offered scant indication of remorse at the Maryland hearing and that there is no evidence of this in the Georgia record.

Having reviewed this evidence, the undersigned shares questions about the disproportionate disciplinary statistics of our sister state. Yet, Roberson's high level of profession-

al success suggests that he has no need of affirmative action; the substantial quality of the evidence supporting the disciplinary action, only peremptorily disputed, makes racial discrimination unlikely. Despite the extensive mitigation, the undersigned concludes that the broad array of professional misconduct in this serious matter calls for substantial disciplinary action such as disbarment or suspension and recommends this.

Judge Caroom, then, determined that the Respondent violated MPPC 8.4(a) and (c) (Misconduct), MRPC 1.7(a),(b) and (c) (Conflict of Interest), MRPC 1.5(a) (Clearly Excessive Fees), MRPC 1.5(i) (Contingent Fee), and MRPC 1.15 (Safekeeping Property) based upon his finding that the Georgia disciplinary proceeding and the adjudication of guilt of misconduct satisfied the requirements of Maryland Rule 16–773 and were "conclusive evidence" of the misconduct.

Bar Counsel took no exceptions to Judge Caroom's findings of fact and conclusions of law. On December 26, 2002, Respondent filed belated exceptions in this Court, iterating complaints which he had previously registered with the hearing court and, additionally, professing his remorse. Those earlier complaints involved the standard of proof applied in the Georgia proceeding, Roberson's rejected demand for a jury trial in the Georgia proceeding, and the procedural rules that were adopted by the Georgia Supreme Court after the misconduct occurred but before the action was filed. Maryland Rule 16–773(g), by its terms, limits challenges to the original adjudication in reciprocal discipline cases to "notice and opportunity to be heard" or "infirmity of proof." This Court, even prior to the adoption of this Rule, has recognized that Respondent is not allowed to collaterally attack either the findings of fact or the judgment rendered by the original jurisdiction. *Attorney Grievance Comm'n v. Sabghir,* 350 Md. 67, 81, 710 A.2d 926, 932–33 (1998). Further, Respondent's remorse, although a factor that may be considered in fashioning a sanction, *see Attorney Grievance Comm'n v. Dunietz,* 368 Md. 419, 430, 795 A.2d 706, 712 (2002), also does not come

within an exception to the mandate of reciprocal discipline when properly proven. Respondent's exceptions are, therefore, overruled.

Turning to the appropriate sanction, Bar Counsel has recommended that Respondent be disbarred from the practice of law as he was in the State of Georgia. Respondent has requested that we consider a twelve-month suspension, with reinstatement conditioned upon one or all of the following:

A. Successfully completing a course in Legal Ethics [Course to be approved by the Attorney Grievance Commission of Maryland or this Court];

B. If the Respondent re-enters the practice of law, appoint a monitor of all trust account activity for the period of one (1) year from the date the Respondent re-enters the practice of law [The monitor to be appointed by this Court or the Attorney Grievance Commission of Maryland]; and

C. If the Respondent re-enters the practice of law, require him to perform a set number of hours annually for two (2) years in *pro bono* representation; such *pro bono* clients to be assigned by Maryland Legal Aid or other entity engaged in indigent representation in the State of Maryland.

This Court very recently reinforced its attitude toward imposition of sanction in a reciprocal discipline case in *Attorney Grievance Comm'n v. Ruffin*, 369 Md. 238, 253–254, 798 A.2d 1139, 1148 (2002):

We are prone, *see Attorney Griev. Comm'n v. Sabghir*, 350 Md. 67, 83, 710 A.2d 926, 934 (1998); *Attorney Griev. Comm'n v. Richardson*, 350 Md. 354, 365–66, 712 A.2d 525, 530–31 (1998), but not required, *see Attorney Griev. Comm'n v. Gittens*, 346 Md. 316, 324, 697 A.2d 83, 87 (1997), to impose the same sanction as that imposed by the state in which the misconduct occurred. Indeed, the Court is duty-bound to assess for itself the propriety of the sanction imposed by the other jurisdiction and that recommended by the Commission, *Gittens*, 346 Md. at 326, 697 A.2d at 88, to

look not only to the sanction imposed by the other jurisdiction, but to the particular facts and circumstances of each case, the outcome being dependent upon the latter, but with a view toward consistent dispositions for similar misconduct. *Attorney Griev. Comm'n v. Willcher,* 340 Md. 217, 222, 665 A.2d 1059, 1061 (1995) (quoting *Attorney Griev. Comm'n v. Parsons,* 310 Md. 132, 142, 527 A.2d 325, 330 (1987)); *Attorney Griev. Comm'n v. Saul,* 337 Md. 258, 267–68, 653 A.2d 430, 434–35 (1995). We ordinarily will defer to the sanctioning State when the two States' purpose in disciplining counsel is the same. *Id.* at 327, 697 A.2d at 88 (footnote omitted).

■ The State of Georgia, similar to Maryland, views the protection of the public as one of the purposes of attorney discipline. This view is evident in *In re Calhoun,* 268 Ga. 675, 677, 492 S.E.2d 514, 515 (1997), where the Supreme Court of Georgia disbarred an attorney "in order to protect the public from improprieties that injure the public's trust in the attorney-client relationship." *See also In re Allison,* 267 Ga. 638, 642, 481 S.E.2d 211, 215 (1997) (recognizing that "the primary purpose of disciplinary proceedings . . . is to protect the public from attorneys who are not qualified to practice law due to incompetence or unprofessional conduct").

As a result, deferral to the discipline imposed in Georgia is appropriate. As we have noted, Respondent has not demonstrated by "clear and convincing evidence" that his defenses are within the exceptional circumstances of Rule 16–773(e), nor do the mitigating circumstances found by the hearing judge provide sufficient bases for a lesser sanction than was entered in Georgia. In *Sabghir,* we stated:

When the Court considers the appropriate sanction in a case of reciprocal discipline, we look not only to the sanction imposed by the other jurisdiction but to our own cases as well. The sanction will depend on the unique facts and circumstances of each case, but with a view toward consistent dispositions for similar misconduct.

350 Md. at 83–84, 710 A.2d at 934 (quoting *Willcher,* 340 Md. at 222, 665 A.2d at 1061 (quoting *Parsons,* 310 Md. at 142, 527 A.2d at 330)). Respondent, although without disciplinary blemish in Georgia or Maryland prior to these proceedings, was found guilty of some of the most egregious misconduct, involving dishonesty, impairment of professional judgment, charging a clearly excessive fee, wilful disregard of a legal matter, and theft of client funds, among others. In similar situations, we have disbarred other attorneys who have committed such misconduct. *See, e.g., Attorney Grievance Comm'n v. McLaughlin,* 372 Md. 467, 509–10, 813 A.2d 1145, 1170–71 (2002) (disbarring an attorney for professional misconduct, including theft of client funds, charging clearly excessive fees, and self-dealing); *Attorney Grievance Comm'n v. Spery,* 371 Md. 560, 568–72, 810 A.2d 487, 491–94 (2002) (disbarring attorney for theft from his real estate partners despite the attorney's previously unblemished twenty-eight year practice); *Attorney Grievance Comm'n v. Bernstein,* 363 Md. 208, 219–225, 768 A.2d 607, 613–16 (2001) (disbarring attorney for numerous violations of MRPC for conduct involving deceit, the failure to communicate a contingent fee agreement in writing, and the misappropriation of client funds); *Attorney Grievance Comm'n v. Morris,* 298 Md. 299, 307–08, 469 A.2d 853, 857 (1984) (disbarring for attorney misconduct, such as charging clearly excessive fees, misrepresenting the amount of services rendered on a client bill, and attempting to bill a client for services rendered for another client).

We conclude that deferring to the jurisdiction where the misconduct occurred is appropriate in this case and that the appropriate sanction in this case is that imposed by the Supreme Court of Georgia, namely, disbarment.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST DAVID ROBERSON.*